IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | : | |
|---|---|---|
| **HILL DISTRIBUTING COMPANY** | : | Case No. 2:11-CV-706 |
| Plaintiff, | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | |
| **ST. KILLIAN IMPORTING CO., INC.,** | : | MAGISTRATE JUDGE DEAVERS |
| Defendant. | : | |
| | : | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on Plaintiff Hill Distributing Company's ("Hill Distributing") motion for a preliminary injunction. (Dkt. 2.) Hill Distributing seeks to enjoin Defendant St. Killian from terminating Hill Distributing's franchise relationship with Carlsberg S/A, through which Hill Distributing is a wholesaler of Carlberg's brands of beer ("the Brands") in Ohio. For the reasons set forth below, the Motion is **GRANTED**.

**II. BACKGROUND**

Hill Distributing is an Ohio distributor of alcoholic beverages to retail permit holders in the state. It possesses franchise relationships with several manufacturers and for at least eight years, it has had the exclusive distribution rights to distribute Carlsberg's products in Central Ohio. St. Killian is a Massachusetts corporation that is involved in the business of importing beer into the United States.

1

Carlsberg, S/A ("Carlsberg"), is a Danish corporation that brews the Brands at issue. In 2004, Carlsberg USA ("CUSA") began importing the Brands into the United States. In 2009, Beverage Alliance began importing the brands instead of CUSA, and CUSA ceased to exist.

In March 2011, Beverage Alliance issued a Confidential Information Memorandum, offering to purchase, merge, or sell its import rights to or with another company. St. Killian submitted a bid to buy the rights, which was ultimately successful.

On June 23, 2011, St. Killian executed a Purchase and Sale Agreement ("P & S") and a Bill of Sale with Beverage Alliance. Through the P & S, which was negotiated at arm's length, St. Killian acquired importation and distribution rights to a number of beer brands for distribution within the United States, including the Carlsberg Brands at issue in this litigation. In exchange, St. Killian paid $1.9 million to Beverage Alliance and its creditors, and paid some of Beverage Alliance's outstanding debt to Carlsberg.

Beverage Alliance notified Carlsberg of the termination of its relationship with the company, and confirmed that its rights to the Brands would cease when the Import Agreement between Carlsberg and St. Killian was executed. The Import Agreement became effective on June 24, 2011.

On August 1, 2011, Hill Distributing received a notice from St. Killian purporting to terminate Hill Distributing's relationship with Carlsberg effective on July 27, 2011, pursuant to O.R.C. 1333.85. St. Killian requested that Hill Distributing provide financial statements for the past three years so that it could determine the fair market value of the Brands.

### III. LAW AND ANALYSIS

In order to obtain a preliminary injunction, this Court balances the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the

movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

### A. Likelihood of Success

The first factor to consider is the moving party's likelihood of success on the merits. In this case, Hill Distributing is likely to prevail, and thus this factor counsels in favor of granting their request for a preliminary injunction.

### 1. Overview of the Ohio Alcoholic Beverages Franchise Act

The Ohio Alcoholic Beverages Franchise Act ("OABFA") governs the franchise relationships between manufacturers and distributors of alcoholic beverages, including beer, within Ohio. Under § 1333.85 of the Act, a franchise cannot be terminated absent prior consent unless just cause exists and notice is provided. R.C. § 1333.85. Subsection (A) of § 1333.85 lists three situations that always constitute just cause: (1) voluntary bankruptcy; (2) involuntary bankruptcy; or (3) loss of liquor permits. Subsection (B) of § 1333.85 lists four situations that never constitute just cause: (1) failure of a party to take action that would result in a violation of federal or state law; (2) restructuring, other than in bankruptcy, of a manufacturer's business; (3) unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of R.C. §§ 1333.82 and 1333.86; and (4) "a manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." Subsection (C) of § 1333.85 governs how a manufacturer and distributor should deal with excess inventory in case of termination.

Subsection (D) of § 1333.85 is an exception to the general rule requiring just cause. Under the terms of (D), if a successor manufacturer "acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer," then it can terminate, via written notice, a previous manufacturer's franchise agreements within 90 days of the date of the acquisition. R.C. § 1333.85(D). Upon termination, the "distributor shall sell and the successor manufacturer shall repurchase the distributor's inventory of the terminated or nonrenewed product or brand" at the "laid-out cost to the distributor including freight and cartage." R.C. §§ 1333.85(C) and (D). The successor manufacturer must also compensate the distributor "for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated." R.C. § 1333.85(D). The value of directly related business includes, but is not limited to, "the appraised market value of those assets of the distributor principally devoted to the sale of the terminated . . . product or brand and the goodwill associated with that product or brand." R.C. § 1333.85(D).

## 2. Successor Manufacturer

St. Killian does not argue that just cause existed, and it is clear that Hill Distributing did not consent. Instead, St. Killian argues that it is a successor manufacturer and thus entitled to terminate the franchise agreement pursuant to the exception in R.C. § 1333.85(D). St. Killian relies on R.C. § 1333.82(B), which defines a "manufacturer" as "a person, whether located in this state or elsewhere, that manufactures or supplies alcoholic beverages to distributors in this state." R.C. § 1333.82(B). Because St. Killian supplies beer to distributors in Ohio, it argues, it qualifies as a manufacturer. *See Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 108 F. Supp. 2d 859, 863 (S.D. Ohio 2000), *aff'd* 74 Fed. App'x 509, 512 (6th Cir. 2003) (finding that

a wine importer qualified as a manufacturer under R.C. §1333.82(B)). As it obtained the rights to distribute the Brands from the previous importer, Beverage Alliance, St. Killian urges it is thus a successor manufacturer under subsection (D). There are two flaws with this argument. First, the statute defines manufacturers, but not successor manufacturers, and thus total reliance on this definition would be misplaced. Second, this argument isolates subsection (D) from the remainder of the statute, and this Court has previously held that subsection (D) cannot be read in isolation, but must be considered in the context of the statute as a whole in order to avoid allowing conduct under subsection (D) that is prohibited under subsection (B). *See InBev USA LLC v. Hill Distributing Corp.*, No. 2:05-cv-00298, 2006 U.S. Dist. LEXIS 97423, at *18–19 (April 3, 2006 S.D. Ohio).

Thus, in order to determine whether St. Killian is a "successor manufacturer," a turn to the case law is required. In *InBev*, this Court found that the OABFA evidenced "a clear legislative intent to deny manufacturers the ability to terminate franchises due to corporate reorganizations or the shifting of brands among entities under common control." *InBev*, 2006 U.S. Dist. LEXIS 97423, at *19. In that case, InBev, the Plaintiff, was formed through the merger of several importers: Labatt, BNA, and Latrobe. Prior to the merger, each of the three importers had independent distribution channels for their brands. In an effort to consolidate after the merger, InBev attempted to terminate some of the franchise agreements held by the individual companies under § 1333.85(D) because it considered itself a "successor manufacturer." The distributor (Hill, the Plaintiff in this case) refused to accept the terminations. In the subsequent litigation, this Court held that the merger was not an arms-length transaction, but effectively a restructuring; no consideration was paid, no products changed ownership control, and all brands remained under the common control of the European brewer. *Id.* at *17–

5

20. A manufacturer can only rely on § 1333.85(D) "when there is a change in ownership and control of brands through an arms-length merger or acquisition." *Id*. at *22. Thus, § 1333.85(B)(2) prevented the termination, and InBev could not use § 1333.85(D) to eviscerate the protections the Ohio legislature had provided in the statute.

In essence, *InBev* established a rule that an entity can only qualify as a "successor manufacturer" under subsection (D) if one of the situations in subsection (B) does not apply. This Court followed this general rule in *Beverage Distributors, Inc. v. Miller Brewing Company*, --- F.Supp.2d ----, 2011 WL 1113282 (S.D. Ohio 2011). In *Beverage Distributors*, this Court found that, after they merged, two beer companies could not terminate franchise agreements under subsection (D) because the same brewers continued to exercise control over the brands at issue. Thus, the situation fell within (B)(4), and (D) could not apply. *Id.* at *13.

Before determining if (D) applies to the case at issue, this Court must determine whether any of the situations described in (B) apply. If so, then St. Killian is limited by the general rule requiring just cause, and cannot use (D) to terminate the franchise relationship with Hill Distributing. As stated above, there are four situations under (B) which never constitute just cause and preclude the application of (D): (1) failure of a party to take action that would result in a violation of federal or state law; (2) restructuring, other than in bankruptcy, of a manufacturer's business; (3) unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of R.C. §§ 1333.82 and 1333.86; and (4) "a manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control." R.C. § 1333.85(B). After considering all four possibilities, (B)(2) applies in this case. Effectively, what has occurred is a restructuring of Carlsberg's business. It maintains control of its Brands, but those brands now have a different

importer into the United States.  Carlsberg continues to brew the beers, own the intellectual property, and approve the marketing campaigns.  Additionally, it may terminate St. Killian under various circumstances and obtain a new importer.  In essence, this is a restructuring of Carlsberg's importation arrangement, although its ownership and control of the Brands has never wavered.  A final determination of this issue will require more factual development, but the Court cannot say at this time that R.C. § 1333.85(D) applies.  At present, R.C. § 1333.85(B)(2) is most applicable.

Nevertheless, there are some issues that give the Court pause.  On the one hand, this case is similar to *InBev* because the general situations are the same: a brewer obtained a new importer, which then attempted to terminate a franchise agreement.  On the other, this case is markedly different because, unlike the paper merger at issue in *InBev*, St. Killian bought the rights to import the Brands from Beverage Alliance.  There are two reasons, however, that this distinction is unpersuasive to the Court.  First, Carlsberg had to approve of St. Killian as its new importer.  Thus, it continued to maintain control over its Brands and was effectively reorganizing its business structure.  Second, the policy rationale behind OABFA supports finding in favor of Hill Distributing in this case.  The purpose of the Act is to "protect distributors from certain practices of beverage manufacturers."  *Beverage Distrib., Inc v. Miller Brewing Co.*, Nos. 2:08-cv-827, 2:08-cv-931; 2:08-cv-1112, 2:08-cv-1131, 2:09-cv-0022, 2009 WL 1542730, at *5 (S.D. Ohio June 2, 2009).  In particular, Ohio has recognized that distributors invest significant time and resources into promoting their products.  If manufacturers could unilaterally terminate their agreements, these distributors would be exposed to great harm.  *Id.*  This Act is designed "'to remedy the lack of equal bargaining power between Ohio's alcoholic beverage wholesalers and out-of-state beverage manufacturers.'" *Beverage Distrib.*, 2011 WL 1113282, at * 12 (quoting

*Esber Beverage Co. v. LaBatt USA Operating Co.*, NO. 2009-cv-03142 at 8 (Stark Cnty. Ohio Common Please Dec. 1, 2009)). These policy concerns militate in favor of Hill Distributing in this case.

In sum, because the Brands have never changed hands, and remain under the ownership and control of Carlsberg, Hill Distributing has a strong likelihood of success on the merits. The change of importer is likely a business rearrangement, and thus St. Killian may not qualify as a "successor manufacturer" under R.C. § 1333.85(D).

### B. Irreparable Harm

The second factor to consider is the irreparable harm that may result to the moving party. In this case, the Brands make up only a small part of Hill Distributing's portfolio, but Hill argues that they are nevertheless critical to their branding and marketing efforts.

Irreparable harm results when there is no adequate remedy at law. One kind of irreparable harm is the loss of customer goodwill because goodwill is intangible and difficult to calculate. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("The loss of customer good will often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."). Hill Distributing argues that it stands to lose customer goodwill in this situation because it has developed a clientele for the Carlsberg brands and will suffer if it is no longer able to sell these products to its clients. Additionally, Hill Distributing is concerned that the loss of this brand may have a spillover effect, as customers could start to look to other distributors to satisfy all of their needs. It believes that these concerns are particularly acute because beer distributing is a highly competitive, but minimal growth, market.

St. Killian argues that because the Brands make up such a small part of Hill Distributing's total business—.51% and .54% in 2009 and 2010 respectively—the loss in

goodwill is *de minimis*.  In *Tri-County Wholesaler Distributors, Inc. v. The Wine Group*, No. 2:10-cv-693, 2010 WL 3522973, at *8 (S.D. Ohio 2010), this Court found that a franchise termination would lead to irreparable harm because the brands comprised a significant portion of the distributor's sales and the distributor had marketed the brands for decades.  Here, the Brands make up only a small part of Hill Distributing's sales, and they have only been a part of the portfolio for eight years.  Nevertheless, Hill Distributing argues that these sales figures do not adequately represent the likely damages to its goodwill.  As its goodwill is premised on its market niche for imported beers, the Brands are critical to the company's overall portfolio.

Further, St. Killian argues that Hill Distributing has an adequate remedy at law because it can be made whole by monetary damages.  It relies on the OABFA itself, which has a provision to calculate monetary damages for loss of goodwill in connection to terminations by successor manufacturers under § 1333.85(D).[1]  This provision, however, applies when a franchise is terminated by a successor manufacturer and thus is inapplicable to the current situation.

Ultimately, while the Brands make up only a small percentage of Hill Distributing's profit, their impact is felt much more broadly.  There is not currently a brand available that could fill the void, and any new brands to be imported into the state will look for distributors that are growing or in a position to contribute to growth.  Thus, the loss of the Brands would have an

---

[1] According to the statute, upon termination pursuant to subsection (D), the "distributor shall sell and the successor manufacturer shall repurchase the distributor's inventory of the terminated or nonrenewed product or brand" at the "laid-out cost to the distributor including freight and cartage."  R.C. §§ 1333.85(C) and (D).  The successor manufacturer must also compensate the distributor "for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated."  R.C. § 1333.85(D).  The value of directly related business includes, but is not limited to, "the appraised market value of those assets of the distributor principally devoted to the sale of the terminated . . . product or brand and the goodwill associated with that product or brand."  R.C. § 1333.85(D).

impact that resonates long after the initial termination.  Thus, there is a risk of irreparable harm to Hill Distributing.

### C. Harm to Others

The third factor to consider is the harm to others.  As Hill Distributing only seeks to preserve the status quo, this factor counsels in favor of granting their request for a preliminary injunction.

St. Killian argues that it will suffer irreparable harm if its efforts to consolidate its distributors are delayed.  This Court considered this argument in *Tri-County*.  There, the Court found that as an injunction would simply preserve the status quo because the manufacturer would not be placed in a worse position if the injunction were granted.  *Tri-County*, 2010 WL 3522973, at *8.  While St. Killian may suffer from lost or delayed expectations, it will be no worse off than it is now.  Accordingly, this factor counsels in favor of granting the request for a preliminary injunction.

### D.  Public Interest

The fourth factor to consider is the public interest.  As Hill Distributing and St. Killian both believe that Ohio law favors their position, they both argue that the public interest is served when Ohio law is followed.  This Court has found that Ohio law favors Hill Distributing, and thus this argument supports their position that an injunction should be granted.

### E. Balancing the Factors

In sum, the factors support Hill Distributing.  Hill is likely to prevail on the merits and may suffer irreparable harm if the injunction is not granted.  While St. Killian may suffer from disappointed expectations, it will be no worse off in the injunction is granted.  Finally, the public interest favors an injunction.

## IV. CONCLUSION

For the foregoing reasons, Hill Distributing's Motion for a Preliminary Injunction is **GRANTED**. St. Killian is enjoined from terminating Hill Distributing's franchise relationship with Carlsberg. The companies shall maintain the status quo until the case is tried on the merits.

**IT IS SO ORDERED.**

<u>  s/Algenon L. Marbley</u>
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 7, 2011**